[Cite as *Dodaro v. Dodaro*, 2019-Ohio-4864.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Manilyn Dodaro, | : | |
| Plaintiff-Appellee Cross-Appellant, | : | No. 18AP-714 |
| | : | (C.P.C. No. 16DR-3110) |
| v. | : | (REGULAR CALENDAR) |
| Steven Dodaro, | : | |
| Defendant-Appellant Cross-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on November 26, 2019

**On brief**: *David R. Plumb*; and *Micaela C. Deming*, for plaintiff-appellee/cross-appellant. **Argued**: *David R. Plumb*.

**On brief**: *Randy S. Kurek*; and *Jo Kaiser*, for defendant-appellant/cross-appellee. **Argued**: *Jo Kaiser*.

APPEAL from the Franklin County Court of Common Pleas, Division of Domestic Relations

BROWN, J.

{¶ 1} Steven Dodaro, defendant-appellant/cross-appellee, appeals from the judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, in which the court granted Steven and Manilyn Dodaro, plaintiff-appellee/cross-appellant, a divorce.

{¶ 2} The parties were married on March 23, 2013. One child was born as issue of the marriage on August 27, 2013. On August 12, 2016, Manilyn filed a complaint for divorce. On March 27, 2018, the court issued an agreed entry in which the parties resolved

the allocation of parental non-financial rights and responsibilities. The parties also entered into an agreement regarding the partial division of property and real estate.

{¶ 3}    After a trial on the pending issues, on August 22, 2018, the trial court issued a decision and judgment entry decree of divorce. In the decree, the trial court: (1) ordered Steven to pay child support in the amount of $274.58 per month and cash medical support of $108.67, (2) divided certain real and marital property, (3) divided various retirement funds, bank funds, and debts, (4) ordered that neither party pay spousal support to the other, and (5) found Steven in contempt for failing to pay and for failure to comply with the temporary child support order. Both parties appeal the judgment of the trial court.

{¶ 4}    Steven asserts the following assignments of error:

> [I.] The trial [c]ourt's determination as Husband's income, and therefore child support, was not supported by the evidence, was an abuse of discretion, and contrary to law[.]
>
> [II.] The trial [c]ourt's determination as to marital property was not supported by the evidence, was an abuse of discretion, and contrary to law.

{¶ 5}    Manilyn asserts the following cross-assignments of error:

> [I.] The trial court abused its discretion when it found that Steven Dodaro is not voluntarily underemployed.
>
> [II.] [T]he trial court erred in using income averaging to determine Steven Dodaro's income for child support purposes.
>
> [III.] [T]he trial court's finding that Steven only has a 1/3 interest in $20,769.82 of marital property, last held in an account titled only in his name, was against the manifest weight of the evidence.

{¶ 6}    In his first assignment of error, Steven argues the trial court's determination of his income and, therefore, child support, was not supported by the evidence, was an abuse of discretion, and contrary to law. We review child support matters under an abuse-of-discretion standard. *See Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989). An abuse of discretion "connotes more than an error of law or judgment; rather, it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5

Ohio St.3d 217, 219 (1983). When applying an abuse of discretion standard of review, appellate courts must not substitute their judgment for that of the trial courts. *See In re Jane Doe 1*, 57 Ohio St.3d 135, 138 (1991). Furthermore, an appellate court must presume the findings of the trial court are correct because the finder of fact is best able to observe the witnesses and to use those observations to weigh witness credibility. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 81 (1984).

{¶ 7} R.C. 3119.022 governs the procedure for awarding and calculating child support. The statute's overriding concern is to ensure the best interest of the child for whom support is being awarded. *Rock v. Cabral*, 67 Ohio St.3d 108, 110 (1993). Thus, the statute's provisions are mandatory in nature and courts must follow the statute literally and technically in all material aspects. *Marker v. Grimm*, 65 Ohio St.3d 139 (1992), paragraph two of the syllabus. If a trial court makes the proper calculations on the applicable worksheet, the amount shown is "rebuttably presumed" to be the correct amount of child support due. *See Rock* at 110; *see also* R.C. 3119.03.

{¶ 8} In calculating child support, the trial court's starting point is the obligor's "income." *See Murray v. Murray*, 128 Ohio App.3d 662, 666 (12th Dist.1999). Former R.C. 3119.01(C)(5)(a) defines income, for individuals employed to full capacity, to mean "the gross income of the parent." Former R.C. 3119.01(C)(7) defines "gross income" as "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable." Gross income includes salaries and wages, in addition to self-generated income. " 'Self-generated income' means gross receipts received by a parent from self-employment, proprietorship of a business, * * * and rents minus ordinary and necessary expenses incurred by the parent in generating the gross receipts." Former R.C. 3119.01(C)(13). " 'Ordinary and necessary expenses incurred in generating gross receipts' means actual cash items expended by the parent or the parent's business and includes depreciation expenses of business equipment as shown on the books of a business entity." Former R.C. 3119.01(C)(9)(a). "Except as specifically included in 'ordinary and necessary expenses incurred in generating gross receipts' by division (C)(9)(a) of this section, 'ordinary and necessary expenses incurred in generating gross receipts' does not include depreciation expenses and other noncash items that are allowed as deductions on any federal tax return of the parent or the parent's business." Former R.C. 3119.01(C)(9)(b). "A party claiming a business expense has the burden of providing

suitable documentation to establish the expense." *Ockunzzi v. Ockunzzi*, 8th Dist. No. 86785, 2006-Ohio-5741, ¶ 53.

{¶ 9} In the present case, Steven argues the trial court erred when it only allowed certain business expenses be deducted from his self-employment gross receipts. On this matter, the trial court found the following:

> The Plaintiff takes issue with the Defendant's claimed business expenses. The Court does not find that car/truck expenses and depreciation are appropriate expenses for purposes of calculating child support as the Defendant receives a direct benefit in the personal use of these vehicles. The Plaintiff also disputes Defendant's cost of goods sold. The Defendant provided no credible evidence or testimony to support the claim of cost of goods sold to exclude for child support purposes. Nor does his testimony as a whole to the extent of his current work level seem to sustain such numbers. The Court has reviewed the claimed expenses and costs of goods for tax years 2013 through 2016 and finds Defendant's income to be as follows.
>
> 2013 $46,430-$7,388 in allowed business expenses = $39,042.
> 2014 $54,228-$11,899 in allowed business expenses = $42,329[.]
> 2015 $74,776-$10,874 in allowed business expenses = $63,902[.]
> 2016 $62,119-$16,938 in allowed business expenses = $35,450.
>
> The Defendant's income for purposes of child support is averaged to be $62,119 (gross)-$16,938 in average allowed business expenses or $45,181 per year.

(Aug. 22, 2018 Decision & Entry at 6-7.)

{¶ 10} Steven argues the trial court failed to explain why it only allowed certain business expenses to be deducted and had limited or no evidence to support its conclusions. Steven asserts his business expenses were documented in detail on his tax returns, with pages of supplemental information attached, and his tax returns were prepared by a certified public accountant ("CPA"). Steven further points out Manilyn's expert witness admitted he had not reviewed any of the documents that supported the

business expenses and could not provide an income figure to refute what was reflected on the tax returns.

{¶ 11} Federal and state tax documents provide a starting point for calculating a parent's income for child support purposes, but they are not the sole factor for the trial court to consider. *Foster v. Foster*, 150 Ohio App.3d 298, 2002-Ohio-6390, ¶ 12 (12th Dist.), citing *Houts v. Houts*, 99 Ohio App.3d 701, 706 (3d Dist.1995). *See also Dannaher v. Newbold*, 10th Dist. No. 05AP-172, 2007-Ohio-2936, ¶ 12. In *Wood v. Wood*, 10th Dist. No. 10AP-513, 2011-Ohio-679, ¶ 42, this court discussed the difference between determining income pursuant to the Internal Revenue Code and the child support guidelines, as follows:

> Particularly when a parent's income is self-generated, the parent's taxable income may not equal the parent's income as calculated for child support purposes. *Dannaher v. Newbold*, 10th Dist. No. 05AP-172, 2007-Ohio-2936, ¶ 12; *Foster v. Foster*, 150 Ohio App.3d 298, 2002-Ohio-6390, ¶ 13. The purposes underlying the Internal Revenue Code and the child support guidelines are vastly different. *Amlin v. Amlin*, 2d Dist. No. 2008 CA 15, 2009-Ohio-3010, ¶ 70. The federal tax code allows deductions from gross income based on a myriad of economic and social policy reasons that have no bearing on child support. *Id.* In contrast, the child support guidelines focus on determining how much money is actually available for child support purposes. *Id.* Consequently, a trial court must not blindly accept all of the expenses deducted on previous tax returns as ordinary and necessary business expenses incurred in generating gross receipts. *Id.*; *Buening v. Buening*, 3d Dist. No. 10-10-01, 2010-Ohio-2164, ¶ 13, *Dressler v. Dressler*, 12th Dist. No. CA2003-05-062, 2004-Ohio-2072, ¶ 10, 14.

{¶ 12} In *Roubanes v. Roubanes*, 10th Dist. No. 13AP-369, 2013-Ohio-5778, ¶ 10-13, we elaborated:

> As explained in *Marcus v. Marcus*, 2d Dist. No. 98 CA 83 (July 30, 1999):
>
> This exclusion of "depreciation expenses and other noncash items" from ordinary and necessary business expenses for child support purposes is "designed to ensure that a parent's gross income is not reduced by any sum that was not actually expended in the year used for computing child support." *Emary v. Emary* (Oct. 23, 1996), Lorain App. No.

> 96CA006353, unreported, quoting *Baus v. Baus* (1991), 72 Ohio App.3d 781, 784. The reason for this is that depreciation expenses for federal income tax purposes are not "actual cash outlays" of that corporation for the tax year. *Harter [v. Harter*, 3d Dist. No. 1-97-55 (Feb. 26, 1998)].
>
> Thus, for child support purposes, the Ohio Revised Code permits the deduction of depreciation expenses which relate to the replacement of equipment but not the deduction of depreciation expenses for other noncash items. R.C. 3119.01(C)(9)(a) and (b).
>
> * * *
>
> "In computing income for purposes of child support, a court should pay particular attention to the possibility that a spouse who is the sole shareholder of a business is engaged in 'creative accounting' designed to cloak net income. Therefore, the court needs to consider all financial data which relates to the operation of that spouse's business." *Corrigan v. Corrigan*, 8th Dist. No. 74088 (May 13, 1999). The failure to do so has been found to constitute an abuse of discretion. *See Corrigan*; *Bowen v. Thomas*, 102 Ohio App.3d 196, 201 (3d Dist.1995); *Offenberg v. Offenberg*, 8th Dist. No. 78885, 2003-Ohio-269.

{¶ 13} In the present case, Steven fails to point us to any evidence he submitted to support the business expenses he claimed in his tax returns. His argument on appeal is devoid of any effort whatsoever to cite specific evidence beyond the general contentions that the expenses were documented "in detail" in "pages of supplemental information." Furthermore, his argument that his expenses should be deducted from his gross income simply because his tax returns were prepared by a CPA is inadequate and ignores this court's explanation in *Wood* that deductions from gross income based on the federal tax code involve different considerations than deductions from gross income for purposes of determining child support. Therefore, we find this argument without merit.

{¶ 14} Steven also raises a brief argument that the trial court erred when it refused to allow evidence as to his 2017 income, which he claims would have been critical to determining child support. However, he fails to cite to the record where the error can be found. Manilyn directs us to a very brief discussion in the trial transcript that indicates Steven did not provide opposing counsel with his 2017 tax return, and then a discussion

was held off the record. Manilyn asserts the trial court prohibited Steven from presenting his 2017 tax returns at trial as a discovery sanction because he failed to provide such during discovery. Nevertheless, Steven did not proffer his 2017 tax return; thus, we are unable to determine whether this evidence was "critical." Furthermore, Steven does not explain why this evidence was "critical." Thus, this argument is without merit. For these reasons, we overrule Steven's first assignment of error.

{¶ 15} Steven argues in his second assignment of error the trial court's determination as to marital property was not supported by the evidence, was an abuse of discretion, and contrary to law. Pursuant to R.C. 3105.171(B), in divorce proceedings, the court must determine what constitutes marital property and separate property and then "divide the marital and separate property equitably between the spouses." The division "shall be equal" unless equal division would be inequitable. R.C. 3105.171(C)(1). Thus, "[t]he trial court is not required to make an equal division of the marital estate, so long as the division is equitable." *Hadinger v. Hadinger*, 10th Dist. No. 15AP-09, 2016-Ohio-821, ¶ 15, citing *Cherry v. Cherry*, 66 Ohio St.2d 348 (1981), paragraphs one and two of the syllabus. Because the characterization of property as marital or separate is a factual inquiry for the trial court, we review that factual determination under a manifest weight of the evidence standard. *Taub v. Taub*, 10th Dist. No. 08AP-750, 2009-Ohio-2762, ¶ 15.

{¶ 16} R.C. 3105.171(A) provides the following pertinent definitions:

> (3)
>
> (a) "Marital property" means, subject to division (A)(3)(b) of this section, all of the following:
>
> (i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
>
> (ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
>
> (iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage;

\* \* \*

(b) "Marital property" does not include any separate property.

(4) "Passive income" means income acquired other than as a result of the labor, monetary, or in-kind contribution of either spouse.

\* \* \*

(6)

(a) "Separate property" means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:

(i) An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;

(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;

(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage;

\* \* \*

(vii) Any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse.

(b) The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable.

{¶ 17} Steven argues the trial court erred in three instances while making determinations as to what constituted marital and separate property: (1) the entire equity in the Reynoldsburg real estate was separate property and, therefore, should have been awarded to him, (2) his Roth IRA #6666 was separate property, because the $12,000.00 contribution in 2015 was from his separate property, and (3) the WesBanco account

#2462 had no marital component to it; thus, the $6,394.44 determine by the trial court to be marital property should have been awarded to him as separate property.

{¶ 18} With regard to the first argument, Steven argues the entire equity in the Reynoldsburg real estate was separate property and, therefore, should have been awarded to him. In rejecting Steven's argument, the trial court made several findings. The court found Steven purchased the home in 2005 for $148,000.00 with a 15-year mortgage in the amount of $118,920.00. The Franklin County Auditor valued the property at $119,000.00 at the time of trial, and Steven presented no credible evidence as to the current value. The principal balance owed on the mortgage as of December 31, 2012 (three months before the parties married), was $73,651.89. On May 27, 2014, the mortgage was paid in full with a final payment of $30,000.00. The court indicated Steven testified the $30,000.00 final payment came from a premarital $50,000.00 certificate of deposit ("CD") he cashed in, and the court agreed that their income tax returns for 2013 and 2014 suggest the payoff monies could not have come from marital income. However, the court noted that Steven made no effort to document the existence of premarital savings and/or CDs, and Steven's 2012 and 2013 income tax returns do not show any interest earned on any CDs. The court found Steven proved that, at the time of the marriage, he had invested $74,348.11 into the real estate ($29,080.00 down payment + $45,268.11 mortgage reduction = $74,348.11 invested), but had not proven the $73,651.89 paydown/payoff from the date of the marriage until May 27, 2014 was separate property. Thus, the court found 49.76 percent of the real estate was marital property ($73,651.89 paydown/payoff from date of marriage ÷ $148,000.00 purchase price = 49.76 marital percentage). Therefore, the court concluded, $59,214.40 was marital property subject to division between the parties (49.76 marital percentage x $119,000.00 current value of real estate = $59,214.40 marital portion of real estate).

{¶ 19} Steven claims the trial court erred because documentation was not required by law to prove a separate property claim, and his unrefuted testimony as to his separate property was sufficient. Steven points out the loan was paid off in May 2014, barely more than one year after the parties were married, and clearly the parties did not accumulate enough funds during the first 13 and one-half months of their marriage to pay off the mortgage, particularly when they were raising an infant and paying $1,400 per month for the mortgage. Steven also points out their 2014 tax return reported $1,072 of taxable

interest, and their 2015 tax return reported only $201 of taxable interest, which supports his testimony that he sold a $50,000 CD he had bought five or six years earlier in order to make the final $30,000 mortgage payoff.

{¶ 20} After a review of the record, we cannot find the trial court's decision was against the manifest weight of the evidence. Although Steven testified he paid off the remaining balance of the mortgage with proceeds of the sale of a premarital $50,000/five-year CD, the trial court apparently did not find him credible. As proof that he sold his CD, he can only point to the fact that his taxable interest declined from $1,072 in 2014 to $201 in 2015. However, his 2012 tax return reported $405 in taxable interest, and the parties' 2013 tax return reported $237 in taxable interest, rendering his logic untenable. Without any other proof of the source of the funds used to payoff the mortgage, the trial court was well within its authority to find that $59,214.40 was the marital portion of real estate. Therefore, we find Steven's argument without merit.

{¶ 21} Steven next argues his entire Roth IRA #6666 was separate property, because the $12,000.00 contribution in May 2015 was from his separate property and the remaining portion was premarital. The trial court found Steven did not know the source of the deposit and did not document it to be from an identifiable separate fund. Therefore, the court found the $12,000.00, plus growth or loss from December 31, 2015, was marital property. On appeal, Steven argues his unrefuted testimony was that the $12,000.00 deposit came from his separate property and his 2015 tax return shows that he had a withdrawal and rollover from a pension and annuity in 2015. However, Steven's testimony on this issue was very brief, and he clearly testified he did not know the source of the funds for the $12,000.00 contribution to the Roth IRA. Given such, we cannot find the trial court's determination that the $12,000.00 contribution to the Roth IRA was marital property and was against the manifest weight of the evidence.

{¶ 22} Finally, Steven argues the WesBanco account #2462 had no marital component to it; thus, the $6,394.44 determined by the trial court to be marital property should have been awarded to him as separate property.

{¶ 23} Because Manilyn's third cross-assignment of error addresses the same WesBanco account, we will address her argument with Steven's current argument. Manilyn argues in her third cross-assignment of error the trial court's finding that Steven

only has a one-third interest in $20,769.82 of marital property, last held in the WesBanco account titled only in his name, was against the manifest weight of the evidence.

{¶ 24} In its decision, the trial court found that, as of the date of the marriage, there was $147,230.73 in the WesBanco #2462 account; Bruce Smith managed the account, all three were allowed to and did deposit and withdraw from this account; in 2014, the balance of the account was $166,414.06; and Steven withdrew that balance in August 2014. The court found Steven had not proven the difference between the balance at marriage and withdrawal of $19,183.33 was solely his parents' money or otherwise his separate money by a preponderance of the evidence; thus, Steven's one-third interest in the account of $6,394.44, was a marital asset.

{¶ 25} Steven contends that, it was undisputed the WesBanco account was in his name, Bruce Smith (Steven's stepfather), and Betty Smith (Steven's mother), and existed prior to the marriage. Steven points out Manilyn's name was never on the account, he never made deposits to the account, and the account was managed by the Smiths.

{¶ 26} Manilyn argues the WesBanco account was comprised of $20,769.82 in marital property, and the remainder was Steven's separate property. She asserts the parties should equally split the marital portion. Manilyn contends that, as of the date of the parties' marriage on March 23, 2013, the account balance was $145,644.24, and the ending balance of the account in August 2014 was $166,414.06. Manilyn maintains the trial court's finding that $6,394.44 was the marital portion of the account was attributable to two errors: (1) applying an incorrect starting balance as of the date of the marriage of $147,230.73, when it was actually $145,644.24, and (2) finding that Steven only owned one-third of the portion of the funds.

{¶ 27} Initially, with regard to Manilyn's argument that the trial court erred when it found $147,230.73 was the balance of the account on the date of marriage on March 23, 2013, we agree. Plaintiff's exhibit 6 shows a balance of $147,230.73 as of April 1, 2013. However, this included deposits of $1,567.90 and $18.59 on March 27, 2013, and April 1, 2013 respectively, which were after the date of the marriage. Thus, the appropriate starting balance as of the date of the marriage on March 23, 2013 was $145,644.24.

{¶ 28} With regard to Manilyn's argument the trial court erred when it found that Steven only owned one-third of the funds, Manilyn asserts: (1) the account was titled in Steven's name, payable on death ("POD") to Betty Smith; thus, Steven was the sole owner

of the account, (2) Steven was the only person permitted to make withdrawals from the account, and there was no evidence that all three were allowed to and did withdraw funds from the account, and (3) the source of all deposited funds was Steven's income, regardless of who physically made the deposits, and there was no documentation regarding the source of deposited funds.

{¶ 29} After a review of the parties' arguments, we find the trial court did not err. Steven testified Bruce and Betty Smith managed the account, all three of them could withdraw and deposit into it, Bruce Smith kept the records of the account, he never made any deposits into the account, and Bruce and Betty Smith deposited only their own money into the account. On cross-examination, Steven testified he might have made one or two insignificant deposits into the account and admitted he had no documents to show the source of the deposits during the time in question. Betty testified all three of them, including Steven, made deposits into the account from 2012 to 2014. She did not know how many deposits Steven made to the account, but all three of them made large deposits during that time, some of which were prior to the parties' marriage.

{¶ 30} We cannot find the trial court erred when finding one-third of the WesBanco account was marital property. Steven admitted he made one or two deposits in the account after having testified that he never made any deposits in the account. Betty, his mother, testified Steven made large deposits into the account from 2012 to 2014. Given the nature of the conflicting evidence before the trial court, we cannot say the trial court's decision to find Steven's testimony not credible was erroneous. Furthermore, Betty testified all three of them made large deposits into the account from 2012 to 2014, but she did not know how many deposits Steven made to the account. The trial court's decision turned on witness credibility, and we will not disturb it, as the trial court was in the best position to view the witnesses and their demeanors. Accordingly, we find the determination that Steven's one-third interest in WesBanco account #2462 was a marital asset and was not against the manifest weight of the evidence. However, we find Steven's one-third interest in the marital portion of the account was $6,923.27 ($166,414.06 ending balance - $145,644.24 starting balance = $20,769.82 marital ÷ 3 owners = $6,923.27). For the foregoing reasons, Steven's second assignment of error is overruled, and Manilyn's third cross-assignment of error is sustained in part and overruled in part.

{¶ 31} Manilyn argues in her first cross-assignment of error the trial court abused its discretion when it found that Steven is not voluntarily underemployed. A trial court may impute income to an obligor based on "potential income" if the obligor is voluntarily underemployed. Former R.C. 3119.01(C) stated in pertinent part:

> (11) "Potential income" means both of the following for a parent who the court pursuant to a court support order, or a child support enforcement agency pursuant to an administrative child support order, determines is voluntarily unemployed or voluntarily underemployed:
>
> (a) Imputed income that the court or agency determines the parent would have earned if fully employed as determined from the following criteria:
>
> (i) The parent's prior employment experience;
>
> (ii) The parent's education;
>
> (iii) The parent's physical and mental disabilities, if any;
>
> (iv) The availability of employment in the geographic area in which the parent resides;
>
> (v) The prevailing wage and salary levels in the geographic area in which the parent resides;
>
> (vi) The parent's special skills and training;
>
> (vii) Whether there is evidence that the parent has the ability to earn the imputed income;
>
> (viii) The age and special needs of the child for whom child support is being calculated under this section;
>
> (ix) The parent's increased earning capacity because of experience;
>
> (x) The parent's decreased earning capacity because of a felony conviction;
>
> (xi) Any other relevant factor.
>
> (b) Imputed income from any nonincome-producing assets of a parent, as determined from the local passbook savings rate or another appropriate rate as determined by the court or

agency, not to exceed the rate of interest specified in division (A) of section 1343.03 of the Revised Code, if the income is significant.

{¶ 32} "The parent's subjective motivations for being *voluntarily* unemployed or underemployed play no part in the determination whether potential income is to be imputed to that parent in calculating his or her support obligation." (Emphasis sic.) *Rock* at 111. A trial court's determination that a parent is voluntarily underemployed for purposes of calculating child support under R.C. 3119.01 and assessment of imputed income the parent would have earned if fully employed is reviewed for an abuse of discretion. *Id.*; *Dach v. Homewood*, 10th Dist. No. 14AP-502, 2015-Ohio-4191, ¶ 59; *Misra v. Mishra*, 10th Dist. No. 17AP-306, 2018-Ohio-5139, ¶ 25.

{¶ 33} Here, the trial court found Steven was not voluntarily underemployed. The court reasoned that: (1) Steven's income and work level has been constant throughout the parties' marriage, and his income was consistent with their standard of living, (2) Steven is 62 years old and does not enjoy exceptionally good health, and many of Steven's physical ailments are exacerbated by the physical demands of residential plumbing, and (3) there was insufficient evidence to demonstrate there was available work and/or employment to substantiate Manilyn's request.

{¶ 34} Steven categorizes these findings as pertaining primarily to the following R.C. 3119.01(C)(11)(a) factors: (iii)—physical disabilities; (iv)—availability of employment; (vii)—ability to earn imputed income; and (xi)—any other relevant factor. With regard to factor (iii)—physical disabilities, Manilyn argues no medical professionals have ordered Steven to cease or reduce his work, but he has chosen to be underemployed due to aches and pains. She contends that because Steven has continued to work through his aches and pains, the aches and pains are merely a factor in his otherwise voluntary decision to reduce his self-employment to eight hours or fewer per week. We disagree.

{¶ 35} Steven testified he has disk issues, his arthritis is pretty severe, and his hips affect him, and these conditions prevent him from working more than eight hours per week. Steven said plumbing is physically demanding. He testified that plumbing involves climbing ladders, working in concealed spaces above and below you, use of heavy wrenches, kneeling, and frequent bending. He testified he was not strong anymore, like when he was younger, and sometimes gets injured if he picks up something heavy. He

stated he was ready to retire two or three years ago, but his financial situation worsened. At the hearing, he showed his hands were blistered, calloused, and cracked, and his thumb was worn out. His arthritis makes it hard for him to look up, and he walks with a limp. Based on Steven's testimony, we find the trial court was well within its discretion to find Steven's physical disabilities limited the amount of hours he could work and, thus, limited his income. This factor would support a finding that Steven was not voluntarily underemployed.

{¶ 36} With regard to (iv)—availability of employment, and (vii)—ability to earn imputed income, Manilyn argues that, despite the trial court's finding, Steven never testified he only worked eight or fewer hours per week due to the lack of available work. Manilyn also asserts there was sufficient information from which the trial court could infer that the opportunity for additional work was available to Steven, given that Steven testified his income for 2015 was higher than in other years because he was working as much as he could, suggesting there was additional work available in 2013, 2014, and 2016 that he did not seize upon as he did in 2015. As the party claiming the other parent is voluntarily underemployed, Manilyn had the burden of proof. *See Smith v. Smith*, 10th Dist. No. 99AP-453 (Feb. 10, 2000). *See also Ketchum v. Coleman*, 2d Dist. No. 2013 CA 28, 2014-Ohio-858, ¶ 17. Initially, that Steven's income was higher in 2015 does not necessarily show there was available work in other years. Regardless, the trial court's finding on this issue was only there was insufficient evidence to demonstrate there was available work or employment. After reviewing the record, we agree. As Manilyn contends, the trial court could have inferred that additional work was available in other years based on the fact that Steven's adjusted gross income in 2015 was substantially higher due to what he stated was his desire to work as much as he could because the parties were building a house. However, the trial court apparently chose not to infer such for other years without supporting evidence. The trial court also could have considered the extra work Steven completed in 2015 could not reasonably support an inference of "available" work in other years because of the beyond normal efforts it took for Steven to complete such extra work. Steven testified the income he earned in 2015 was not a fair amount of his expected income because it was "over and above" what he normally worked. He stated an income range from pre-2015 years properly reflected his long-term income, although the 2015 income could "perhaps" be the top end of his income prospects.

Nevertheless, in the end, the trial court did not believe the 2015 income represented his typical yearly income. Manilyn has failed to overcome the high hurdle of demonstrating an abuse of discretion.

{¶ 37} With regard to (xi)—any other factor, Manilyn argues the standard of living the parties maintained is not particularly probative of the voluntary unemployment issue here, but, even if it was relevant, a history of a divorcing couple meeting their marital standard of living with low effort does not foreclose a finding that the obligor is voluntarily unemployed. Again, Manilyn has failed to overcome her difficult burden of demonstrating an abuse of discretion. Although we agree with Manilyn that income consistent with the martial standard of living is not conclusive of a voluntary underemployment inquiry, we do believe it could lend some support to a conclusion the parties were employed consistent with their normal, historical, or average efforts and abilities and were not underemployed. Therefore, we find Manilyn's argument without merit. For these reasons, we overrule Manilyn's first cross-assignment of error.

{¶ 38} Manilyn argues in her second cross-assignment of error the trial court erred when it used income averaging to determine Steven's income for child support purposes. R.C. 3119.05(H) provides that "[w]hen the court * * * calculates annual income, the court * * * when appropriate, may average income over a reasonable period of years." *See also Rhoades v. Priddy-Rhoades*, 10th Dist. No. 06AP-740, 2007-Ohio-2243, ¶ 11. A trial court's decision to employ income averaging under R.C. 3119.05(H) will not be reversed absent an abuse of discretion. *Id.*, citing *Scott G.F. v. Nancy W.S.*, 6th Dist. No. H-04-015, 2005-Ohio-2750. This court has determined income averaging is particularly appropriate where income is unpredictable or inconsistent. *Banchefsky v. Banchefsky*, 10th Dist. No. 09AP-1011, 2010-Ohio-4267, ¶ 21; *Marquard v. Marquard*, 10th Dist. No. 00AP-1345 (Aug. 9, 2001). A trial court, having the "best position to weigh the facts and circumstances of the case," must decide if the averaging method is appropriate on a case-by-case basis. *Wright v. Wright*, 8th Dist. No. 91026, 2009-Ohio-128, ¶ 24.

{¶ 39} Here, Steven's income from his own plumbing business has been inconsistent over the course of years considered by the trial court. The court found Steven's income, after allowed business expenses, was $39,042 in 2013, $42,329 in 2014, $63,902 in 2015, and $35,450 in 2016, for an average of $45,181 per year. Manilyn's argument herein is that income averaging was not appropriate because Steven did not

work a full year for 2013, 2014, or 2016 because he was in the Philippines, and he only worked a full year in 2015. Thus, Manilyn claims, it was inappropriate to average three years of partial-year income with one year of full-year income. We disagree. Despite the fact the parties spent considerable time together in Manilyn's home country of the Philippines in 2013, 2014, and 2016, the figures for those years, in fact, constituted all of the income Steven earned in those calendar years. Steven testified the parties spent that time together in the Philippines in those years by agreement in order to introduce their son to her family, look for property, and build a house. As explained above, former R.C. 3119.01(C)(12) defines "gross income" as "the total of all earned and unearned income from all sources during a calendar year." Steven's gross income used for 2013, 2014, and 2016 fits within the definition of former R.C. 3119.01(C)(7). Manilyn has not shown an abuse of discretion by the trial court in averaging Steven's income for years 2013 through 2016. For these reasons, we overrule Manilyn's second cross-assignment of error.

{¶ 40} Accordingly, we overrule Steven's first and second assignments of error and Manilyn's first and second cross-assignments of error. We sustain in part and overrule in part Manilyn's third cross-assignment of error. Therefore, the judgment of the Franklin County Court of Common Pleas, Domestic Relations is affirmed in part and reversed in part, and we remand the matter for the trial court to recalculate Steven's one-third interest in WesBanco account #2462, consistent with our decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

DORRIAN and McGRATH, JJ., concur.

McGrath, J., retired, formerly of the Tenth Appellate District, Assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).

_____